
MARTIN, *Plaintiff in Error*, v. MOTT, *Defendant in Error*.

[CONSTITUTIONAL LAW.]

The authority to decide whether the exigencies contemplated in the Constitution of the United States, and the act of Congress of 1795, ch. 101. in which the President has authority to call forth the militia, " to execute the laws of the Union, suppress insurrections, and repel invasions," have arisen, is exclusively vested in the President, and his decision is conclusive upon all other persons.

Although a militia man, who refused to obey the orders of the President, calling him into the public service under the act of 1795, is not, in the sense of that act, " employed in the service of the United States," so as to be subject to the rules and articles of war; yet he is liable to be tried for the offence under the 5th section of the same act, by a Court Martial called under the authority of the United States.

Where, in an action of replevin, the defendant, being a Deputy Marshal of the United States, *avowed* and justified the taking the plaintiff's goods, by virtue of a warrant issued to the Marshal of the District, to collect a fine imposed on him by the judgment of a Court Martial, described as a General Court Martial composed of officers of the militia of the State of New-York, in the service of the United States, (*six* in number, and naming them,) duly organized and convened, by general orders, issued pursuant to the act of Congress of February 28, 1795, ch. 101., for the trial of those of the militia of the State of New-York, ordered into the service of the United States in the third military district, who had refused to rendezvous and enter into the service of the United States, in obedience to the orders of the Commander in Chief of the State of New-York, of the 4th and 29th of August, 1814, issued in compliance with the requisition of the President made in pursuance of the same act of Congress, and alleging that the plaintiff, being a private in the militia, neglected and refused to rendezvous, &c., and was regularly tried by the said General Court Martial, and duly convicted of the said delinquency : *Held*, that the avow was good.

ERROR to the Court for the Trial of Impeachments and Correction of Errors of the State of New-York.

This was an action of replevin, originally brought in the Supreme Court of New-York by the defendant in error, Mott, against the plaintiff in error, Martin, to which an avowry was filed, containing, substantially, the following allegations: That on the 18th of June, 1812, and from thence until the 25th of December, 1814, there was public and open war between the United States of America, and the United Kingdom of Great Britain and Ireland, and its dependencies, and the citizens and subjects of the said countries respectively; and that during the continuance of the said war, to wit, on the 4th day of August, 1814; and also, on the 29th day of the same month, in the same year, at the city of New-York, to wit, at Poughkeepsie, in the county of Dutchess, his Excellency Daniel D. Tompkins, Esq. was then and there Governor of the State of New-York, and Commander in Chief of the militia thereof, and being so Governor and Commander in Chief, he, the said Daniel D. Tompkins, as such Governor and Commander in Chief, on the several days last aforesaid, and in the year aforesaid, and at the place aforesaid, upon the previous requisitions of the President of the United States, for that purpose made, and to him directed, as such Governor and Commander in Chief, did issue two several general orders, bearing date respectively on the said 4th and 29th days of August, in the year aforesaid, in and by which said two general orders, among other things, the said Daniel D. Tompkins, as Governor and Commander in Chief as aforesaid, pursuant to such requisitions, and in compliance therewith, did detail certain parts and portions of the militia of the State, as he was required to do, in and by the requisitions of the President of the United States, as aforesaid, and did order the militia so detailed into the service of the United States of America, at the city of New-York, within the third military district of the said United States, as in and by the said two general orders may more fully appear. That the said Jacob E. Mott, on the several days, and in the year aforesaid, and until the 25th day of December, in the same year, being a white citizen of the said State of New-York, inhabiting and residing within the same, and between the ages of eighteen

and forty-five years, was liable to do military duty in the militia of the said State; and was a private in the militia of the said State that was so detailed and ordered into the service of the United States aforesaid, and as such private in said militia was bound to do military duty in the militia of the said State so detailed and ordered into the service of the United States. in the third military district of the United States. That on the 24th of September, 1814, Morgan Lewis, Esq. was a Major General, commanding the army of the United States, of the third military district of the said United States, in which district the militia of the State of New-York, detailed and ordered into the service of the United States as aforesaid, had been ordered to do military duty in the service of the United States. And the said Morgan Lewis, so being a Major General, and commanding as aforesaid, did, on the day, and in the year last aforesaid, as such Major General and commander, issue general orders to convene a general Court Martial for the purpose in the said orders expressed, composed of so many, and such militia officers in the service of the United States, in the said third military district, as in the said orders are mentioned ; it having been then and there considered and adjudged by the said Morgan Lewis, that a greater number of officers than those detailed on the said Court Martial, could not be spared from the service of the United States without manifest injury to the said service ; which said general orders are in the words and figures following, to wit : " Adjutant General's Office, 3d M. D. New-York, 24th September, 1814. General Orders. A General Court Martial, under the act of Congress of the 28th of February, 1795, for the trial of those of the militia of the State of New-York, ordered into the service of the United States, in the third military district, who have failed to rendezvous pursuant to orders, will convene on Monday, the 26th instant, at Harmony Hall, and will consist of the following members," (enumerating them, being six in number,) which General Court Martial was continued (although varied as to its members) by various general orders set out in the avowry

1827.

Manun v. Mott.

until the 13th of May, 1818. That the said J. E. Mott, being so liable, &c. did fail, neglect, and refuse to rendezvous and enter into the service of the United States, in obedience to the orders issued by the Governor of the State, on the requisition of the President of the United States, and in compliance therewith. That on the 30th of May, 1818, the said Court Martial convened at Poughkeepsie, within the said third military district, at which time and place, the said Jacob E. Mott was duly summoned to appear before the said Court Martial; and did then and there appear before the said Court Martial, and make his defence to the charges alleged against him as aforesaid. That the said General Court Martial then and there tried the said Jacob E. Mott for having failed, neglected, and refused to rendezvous, and enter into the service of the United States, in obedience to the orders aforesaid, issued in compliance with the requisition aforesaid; and after hearing the proofs and allegations, as well on the part of the United States, as on the part of the said Jacob E. Mott, then and there convicted the said Jacob E. Mott of the said delinquency; and thereupon the said General Court Martial imposed the sum of 96 dollars as a fine on the said Jacob E. Mott, for having thus failed, neglected, and refused to rendezvous, and enter into the service of the United States, when thereto required as aforesaid. That before the said last mentioned day, to wit, on the 25th of December, 1814, a treaty of peace was made and concluded between the United States and the United Kingdom of Great Britain and Ireland and its dependencies; and that the said Morgan Lewis, and Daniel D. Tompkins, the Major Generals who issued the orders organizing, convening, and continuing the said General Court Martial as aforesaid were not continued as such Major Generals as aforesaid, in the service of the United States aforesaid, at the time herein next afterwards mentioned, nor was there any other officer of equal grade with the said last mentioned Major Generals in the service of the United States, commanding in the military district aforesaid, at the time the said Court imposed the fine and sentence aforesaid.

on the said plaintiff as aforesaid, by whom the said sentence could be approved; but that the said fine, sentence, and proceedings of the said Court Martial, so far as they related to the case of the said Jacob E. Mott, were duly approved by the President of the United States, before the same were certified by the President of the Court Martial aforesaid, to the Marshal of the Southern District of the State of New-York, as hereinafter mentioned, and before the 4th day of June, 1814. That the President of the said General Court Martial, afterwards, to wit, on the day and year, and at the place last aforesaid, in pursuance to the statute of the United States, in such case made and provided, did make a certificate in writing, whereby he did, under his hand, certify to the Marshal of the Southern District of New-York, that the sum of 96 dollars was imposed as a fine on said Jacob E. Mott, for having thus failed, neglected, and refused, to enter the service of the United States, when hereunto required as aforesaid, and that the said Jacob E. Mott was sentenced by the said General Court Martial, on failure of the payment of said fine imposed on him, to twelve months imprisonment.

The avowry then proceeded to state the authority of the plaintiff in error, Martin, as Deputy Marshal, to execute such certificate, and that, in the execution thereof, he took the said goods, &c.

To this avowry the plaintiff in replevin demurred, and assigned the following causes of demurrer:

1. The said defendant, in his said avowry, does not allege that the President of the United States had adjudged that there was an invasion, or imminent danger of an invasion; or that any of the exigencies had occurred, in which the President is empowered to call out the militia by the Constitution of the United States.

2. The said defendant in the said avowry does not aver that any such previous requisition upon the Governor was, in fact, made by the President of the United States; no such requisition is set forth, nor is the date or substance thereof,

or the number of militia thereby required, stated in the said avowry.

3. The said avowry does not state that the said militia were ordered into actual service, in compliance with such requisition; nor does it appear that the militia were required by said requisition to rendezvous or act within the territory of the United States.

4. The said avowry does not sufficiently show or set forth either the particulars or substance of the said orders of the Governor of the State of New-York, in the said avowry mentioned, in such manner that it can appear whether the said orders. or either of them, directed all those of the militia called out thereby, to rendezvous or enter the service of the United States upon the requisition of the said President, solely, or whether the said orders also called out a part of the same militia, by, under, and pursuant to the authority and laws of the State of New-York, without the requisition of the said President, and without designating which were ordered to rendezvous and enter the service by the said respective authorities.

5. The said avowry does not show that the two said several orders of the Governor were cumulative, explanatory of, auxiliary to, or in any way connected with each other; nor whether both of the said orders embraced the same or different persons, and required the same or different duties; nor with such certainty that it can appear whether a disobedience of the other or both of the said orders would be the same, a different, or an additional offence, subject to the same or different jurisdiction; nor does it state the number of the militia called out by the said orders, so that it can appear whether in that respect the said orders were in compliance with the requisitions of the President, nor by which of the said orders the said plaintiff was called forth into the service of the United States ; in all which the said avowry is uncertain and insufficient.

6. The said avowry is double and uncertain, inasmuch as therein the said plaintiff is charged with having committed two several offences in the disobedience of the two said se-

veral orders of the Governor, without showing that both offences were necessary for the trial and conviction of the said plaintiff; or any reason why the said orders should be so blended together; and because the said orders are so blended together without showing any dependence upon each other, or any connexion between them.

7. The general orders in the said avowry set forth, under and by virtue of which the said Court Martial was convened, and tried, convicted, and fined the said plaintiff, are deficient, uncertain, vague, inoperative, void, and of no effect, and conferred upon the said Court Martial, or the members thereof, no jurisdiction over the said plaintiff, or the offence with which he is charged in the said avowry, inasmuch as the said last mentioned general orders convened said Court Martial for the trial of those of the militia of the State of New-York, ordered into the service of the United States, in the third military district, who had failed to rendezvous pursuant to orders, without specifying in any manner when, by whom, to whom, or by what authority, or in what manner such orders should have been issued in regard to the said militia, or when such militia had failed to rendezvous, or whether the orders pursuant to which said militia should have failed to rendezvous, were the same orders calling said militia into service in said third military district, or required them to rendezvous elsewhere or otherwise.

8. The said defendant in his said avowry states, that the said Court Martial was duly convened in pursuance of the said several general orders, in the said avowry set forth, on the 24th day of October, 1814; a day long before the last of the said general orders, by which the said Court is stated to have been duly convened, was issued, as appears by the said avowry, all which is repugnant and contradictory.

9. The orders for convening the said Court Martial, as in the said avowry set forth, are further uncertain, because by the said orders, the said Court Martial is stated to have been convened under the act of Congress of the 28th day of February, 1795, without showing which of the acts of Congress of that date is intended.

Vol. XII

10. The trial of the said plaintiff by the said Court Martial, as appears by the said avowry, was in a time of profound peace.

11. The said Court Martial had no power or authority under the said general orders by which they were convened, to try, convict, and fine the said plaintiff, for having failed, neglected, and refused to rendezvous and enter the service of the United States, in obedience to the orders aforesaid, issued in compliance with the requisitions aforesaid.

12. The said Court Martial, consisting of less than thirteen members, had no power nor authority to try, convict, and fine the said plaintiff, at the time said trial was had, it being a time of peace, without showing that thirteen militia officers could not at that time be spared without manifest injury to the service.

13. By the said avowry it doth not appear whether all or how many of the persons detailed by the said general orders as members of the said Court Martial, continued to remain in the service of the United States at the time when the said plaintiff was tried; or that the places of such as had resigned were supplied by others appointed in their stead; or in what manner the said Court was duly convened; or of how many members it was then composed; and whether all the persons who acted as members of the said Court Martial, at the time when the said plaintiff was tried, were then commissioned officers of the militia, of competent rank, and in the service of the United States.

14. The said avowry does not allege that the orders by which the said Court Martial was continued in service until further orders, remained still unrevoked at the time when the said plaintiff was tried.

15. The said avowry does not show in what manner, when, or by whom the said plaintiff was duly summoned to appear before the said Court Martial.

16. The said avowry does not show at what time the said Morgan Lewis and Daniel D. Tompkins were discontinued; nor but that they were such major generals commanding as aforesaid, on the said 13th day of May, 1818; nor

but that at the time of the said trial there was a major general, of equal rank with the said Morgan Lewis and Daniel D. Tompkins, commanding an army in the service of the United States, or some other officer of competent authority, in some military division of territory comprising the said third military district, by whom the sentence of said Court Martial could have been approved.

17. By the said sentence of the said Court Martial, as the same is in the said avowry set forth, the said Gerard Steddiford, president of the said Court, had no power or authority to issue such a certificate as is in the said avowry mentioned, inasmuch as the said certificate is variant from the said sentence.

18. The said defendant does not in his said avowry allege that the said plaintiff ever was in the service of the United States before, at the time when, or after, the said orders of the Governor, of the 4th and 29th days of August, 1814, were issued, or at the time when the said orders for detailing the said Court Martial were issued, when said Court Martial convened, or when the said trial took place, and the said fine was imposed.

19. The said certificate of the said Gerard Steddiford, as in the said avowry set forth, does not show with sufficient certainty by what Court, or by whom, or by what authority the said fine was imposed; nor does it appear that the said Gerard Steddiford made the said certificate, as such president of the said Court Martial, or signed the same in his official capacity.

And also, that the said avowry is, in other respects, uncertain, informal, and insufficient, &c.

The defendant in replevin (now plaintiff in error) joined in demurrer; and judgment was rendered in behalf of the plaintiff in replevin, in the Supreme Court, which was affirmed by the Court for the Trial of Impeachments and Correction of Errors.

The cause was then brought before this Court, by writ of error, under the 25th section of the Judiciary Act of 1789, c. 20.

1827.

Martin
v.
Mott.

*Jan. 17th.*

*Feb. 2d.*

The cause was argued by the *Attorney General*, and Mr. Coxe, for the plaintiff in error, and by Mr. *D. B. Ogden*, for the defendant in error. But as the grounds of argument are fully stated in the opinion of the Court, it has not been thought necessary to insert it.

Mr. Justice STORY delivered the opinion of the Court.

This is a writ of error to the judgment of the Court for the Trial of Impeachments and the Correction of Errors of the State of New-York, being the highest Court of that State, and is brought here in virtue of the 25th section of the Judiciary Act of 1789, ch. 20. The original action was a replevin for certain goods and chattels, to which the original defendant put in an avowry, and to that avowry there was a demurrer, assigning nineteen distinct and special causes of demurrer. Upon a joinder in demurrer, the Supreme Court of the State gave judgment against the avowant; and that judgment was affirmed by the high Court to which the present writ of error is addressed.

The avowry, in substance, asserts a justification of the taking of the goods and chattels to satisfy a fine and forfeiture imposed upon the original plaintiff by a Court Martial, for a failure to enter the service of the United States as a militia-man, when thereto required by the President of the United States, in pursuance of the act of the 28th of February, 1795, c. 101. It is argued that this avowry is defective, both in substance and form; and it will be our business to discuss the most material of these objections; and as to others, of which no particular notice is taken, it is to be understood that the Court are of opinion, that they are either unfounded in fact or in law, and do not require any separate examination.

For the more clear and exact consideration of the subject, it may be necessary to refer to the constitution of the United States, and some of the provisions of the act of 1795. The constitution declares that Congress shall have power " to provide for calling forth the militia, to execute the laws of the Union, suppress insurrections, and repel in-

vasions:" and also " to provide for organizing, arming, and disciplining the militia, and for governing such part of them as may be employed in the service of the United States." In pursuance of this authority, the act of 1795 has provided, " that whenever the United States shall be invaded, or be in imminent danger of invasion from any foreign nation or Indian tribe, it shall be lawful for the President of the United States to call forth such number of the militia of the State or States most convenient to the place of danger, or scene of action, as he may judge necessary to repel such invasion, and to issue his order for that purpose to such officer or officers of the militia as he shall think proper." And like provisions are made for the other cases stated in the constitution. It has not been denied here, that the act of 1795 is within the constitutional authority of Congress, or that Congress may not lawfully provide for cases of imminent danger of invasion, as well as for cases where an invasion has actually taken place. In our opinion there is no ground for a doubt on this point, even if it had been relied on, for the power to provide for repelling invasions includes the power to provide against the attempt and danger of invasion, as the necessary and proper means to effectuate the object. One of the best means to repel invasion is to provide the requisite force for action before the invader himself has reached the soil.

<div style="margin-left:2em"><em>1827.</em><br><em>Martin<br>v.<br>Mott.</em></div>

<div style="margin-left:2em"><em>The act of 1795 is within the constitutional authority of Congress over the militia.</em></div>

The power thus confided by Congress to the President, is, doubtless, of a very high and delicate nature. A free people are naturally jealous of the exercise of military power ; and the power to call the militia into actual service is certainly felt to be one of no ordinary magnitude. But it is not a power which can be executed without a correspondent responsibility. It is, in its terms, a limited power, confined to cases of actual invasion, or of imminent danger of invasion. If it be a limited power, the question arises, by whom is the exigency to be judged of and decided ? Is the President the sole and exclusive judge whether the exigency has arisen, or is it to be considered as an open question, upon which every officer to whom the orders of the

<div style="margin-left:2em"><em>The President of the United States is the exclusive judge whether the exigencies have arisen in which he is authorized to call forth the militia of the Union.</em></div>

President are addressed, may decide for himself, and equally open to be contested by every militia-man who shall refuse to obey the orders of the President? We are all of opinion, that the authority to decide whether the exigency has arisen, belongs exclusively to the President, and that his decision is conclusive upon all other persons. We think that this construction necessarily results from the nature of the power itself, and from the manifest object contemplated by the act of Congress. The power itself is to be exercised upon sudden emergencies, upon great occasions of state, and under circumstances which may be vital to the existence of the Union. A prompt and unhesitating obedience to orders is indispensable to the complete attainment of the object. The service is a military service, and the command of a military nature; and in such cases, every delay, and every obstacle to an efficient and immediate compliance, necessarily tend to jeopard the public interests. While subordinate officers or soldiers are pausing to consider whether they ought to obey, or are scrupulously weighing the evidence of the facts upon which the commander in chief exercises the right to demand their services, the hostile enterprise may be accomplished without the means of resistance. If " the power of regulating the militia, and of commanding its services in times of insurrection and invasion, are (as it has been emphatically said they are) natural incidents to the duties of superintending the common defence, and of watching over the internal peace of the confederacy,"[a] these powers must be so construed as to the modes of their exercise as not to defeat the great end in view. If a superior officer has a right to contest the orders of the President upon his own doubts as to the exigency having arisen, it must be equally the right of every inferior officer and soldier; and any act done by any person in furtherance of such orders would subject him to responsibility in a civil suit, in which his defence must finally rest upon his ability to establish the facts by competent proofs. Such a course

a *The Federalist, No. 29*

would be subversive of all discipline, and expose the best disposed officers to the chances of ruinous litigation. Besides, in many instances, the evidence upon which the President might decide that there is imminent danger of invasion, might be of a nature not constituting strict technical proof, or the disclosure of the evidence might reveal important secrets of state, which the public interest, and even safety, might imperiously demand to be kept in concealment.

If we look at the language of the act of 1795, every conclusion drawn from the nature of the power itself, is strongly fortified. The words are, " whenever the United States shall be invaded, or be in imminent danger of invasion, &c. it shall be lawful for the President, &c. to call forth such number of the militia, &c. as he may judge necessary to repel such invasion." The power itself is confided to the Executive of the Union, to him who is, by the constitution, " the commander in chief of the militia, when called into the actual service of the United States," whose duty it is to " take care that the laws be faithfully executed," and whose responsibility for an honest discharge of his official obligations is secured by the highest sanctions. He is necessarily constituted the judge of the existence of the exigency in the first instance, and is bound to act according to his belief of the facts. If he does so act, and decides to call forth the militia, his orders for this purpose are in strict conformity with the provisions of the law ; and it would seem to follow as a necessary consequence, that every act done by a subordinate officer, in obedience to such orders, is equally justifiable. The law contemplates that, under such circumstances, orders shall be given to carry the power into effect; and it cannot therefore be a correct inference that any other person has a just right to disobey them. The law does not provide for any appeal from the judgment of the President, or for any right in subordinate officers to review his decision, and in effect defeat it. Whenever a statute gives a discretionary power to any person, to be exercised by him upon his own opinion of certain facts, it is a sound rule of con-

1827.

Martin
v.
Mott.

struction, that the statute constitutes him the sole and exclu-sive judge of the existence of those facts.  And, in the pre-sent case, we are all of opinion that such is the true con-struction of the act of 1795.  It is no answer that such a power may be abused, for there is no power which is not susceptible of abuse.  The remedy for this, as well as for all other official misconduct, if it should occur, is to be found in the constitution itself.  In a free government, the danger must be remote, since in addition to the high quali-ties which the Executive must be presumed to possess, of public virtue, and honest devotion to the public interests, the frequency of elections, and the watchfulness of the re-presentatives of the nation, carry with them all the checks which can be useful to guard against usurpation or wanton tyranny.

This doctrine has not been seriously contested upon the present occasion.  It was indeed maintained and approved by the Supreme Court of New-York, in the case of *Vander-heyden* v. *Young*, (11 *Johns. Rep.* 150.) where the reasons in support of it were most ably expounded by Mr. Justice Spencer, in delivering the opinion of the Court.

But it is now contended, as it was contended in that case, that notwithstanding the judgment of the President is con-clusive as to the existence of the exigency, and may be given in evidence as conclusive proof thereof, yet that the avowry is fatally defective, because it omits to aver that the fact did exist.  The argument is, that the power confided to the President is a limited power, and can be exercised only in the cases pointed out in the statute, and therefore it is necessary to aver the facts which bring the exercise within the purview of the statute.  In short, the same principles are sought to be applied to the delegation and exercise of this power intrusted to the Executive of the nation for great political purposes, as might be applied to the humblest officer in the government, acting upon the most narrow and special authority.  It is the opinion of the Court, that this objection cannot be maintained.  When the President ex-ercises an authority confided to him by law, the presump-

It is not neces-sary in such a case that it should appear, in point of fact, that the particular exi-gency actually existed.  It is sufficient that the President has determin-ed it, and all other persons are bound by his decision.

tion is, that it is exercised in pursuance of law. Every public officer is presumed to act in obedience to his duty, until the contrary is shown; and, *a fortiori*, this presumption ought to be favourably applied to the chief magistrate of the Union. It is not necessary to aver, that the act which he may rightfully do, was so done. If the fact of the existence of the exigency were averred, it would be traversable, and of course might be passed upon by a jury; and thus the legality of the orders of the President would depend, not on his own judgment of the facts, but upon the finding of those facts upon the proofs submitted to a jury. This view of the objection is precisely the same which was acted upon by the Supreme Court of New-York, in the case already referred to, and, in the opinion of this Court, with entire legal correctness.

Another objection is, that the orders of the President are not set forth; nor is it averred that he issued any orders, but only that the Governor of New-York called out the militia upon the requisition of the President. The objection, so far as it proceeds upon a supposed difference between a *requisition* and an *order*, is untenable; for a requisition calling forth the militia is, in legal intendment, an order, and must be so interpreted in this avowry. The majority of the Court understood and acted upon this sense, which is one of the acknowledged senses of the word, in *Houston* v. *Moore*, (5 *Wheat. Rep.* 1.) It was unnecessary to set forth the orders of the President at large; it was quite sufficient to state that the call was in obedience to them. No private citizen is presumed to be conversant of the particulars of those orders; and if he were, he is not bound to set them forth in *hæc verba.*

*It is unnecessary to set out the orders of the President. It is sufficient to show that the Governor of the State called out the militia upon the requisition of the President.*

The next objection is, that it does not sufficiently appear in the avowry that the Court Martial was a lawfully constituted Court Martial, having jurisdiction of the offence at the time of passing its sentence against the original plaintiff.

*Examination of the objections to the avowry, upon other grounds.*

Various grounds have been assigned in support of this objection. In the first place, it is said, that the original plaintiff was never *employed* in the service of the United States, but refused to enter that service, and that, consequently, he was not liable to the rules and articles of war.

Vol. XII.

1827.

Martin
v.
Mott.

1827.

Martin
v.
Mott.

*A militiaman, who refuses to obey the orders of the President calling him into the public service, is liable to be tried for the offence under the 6th section of the act of 1795.*

or to be tried for the offence by any Court Martial organized under the authority of the United States. The case of *Houston* v. *Moore*, (5 *Wheat. Rep.* 1.) affords a conclusive answer to this suggestion. It was decided in that case, that although a militiaman, who refused to obey the orders of the President calling him into the public service, was not, in the sense of the act of 1795, " employed in the service of the United States" so as to be subject to the rules and articles of war ; yet that he was liable to be tried for the offence under the 5th section of the same act, by a Court Martial called under the authority of the United States. The great doubt in that case was, whether the delinquent was liable to be tried for the offence by a Court Martial organized under State authority.

*Objection to the avowry, that the Court Martial was not composed of the number of officers required by law.*

In the next place, it is said, the Court Martial was not composed of the proper number of officers required by law. In order to understand the force of this objection, it is necessary to advert to the terms of the act of 1795, and the rules and articles of war. The act of 1795 (s. 5.) provides, " that every officer, non-commissioned officer, or private of the militia, who shall fail to obey the orders of the President of the United States," &c. shall forfeit a sum not exceeding one year's pay, and not less than one month's pay, to be determined and adjudged by a Court Martial." And it further provides, (s. 6.) " that Courts Martial for the trial of militia shall be composed of militia officers only." These are the only provisions in the act on this subject. It is not stated by whom the Courts Martial shall be called, nor in what manner, nor of what number they shall be composed. But the Court is referred to the 64th and 65th of the rules and articles of war, enacted by the act of 10th of April, 1806, ch. 20., which provide, " that General Courts Martial may consist of any number of commissioned officers from five to thirteen inclusively ; but they shall not consist of less than thirteen, where that number can be convened without manifest injury to the service :" and that " any general officer commanding an army, or colonel commanding a separate department, may appoint General Courts Martial when necessary." Supposing these clauses applicable to the Court Martial in question, it is very clear,

that the act is merely directory to the officer appointing the Court, and that his decision as to the number which can be convened without manifest injury to the service, being in a matter submitted to his sound discretion, must be conclusive. But the present avowry goes further, and alleges, not only that the Court Martial was appointed by a general officer commanding an army, that it was composed of militia officers, naming them, but it goes on to assign the reason why a number short of thirteen composed the Court, in the very terms of the 64th article; and the truth of this allegation is admitted by the demurrer. Tried, therefore, by the very test which has been resorted to in support of the objection, it utterly fails.

But, in strictness of law, the propriety of this resort may admit of question. The rules and articles of war, by the very terms of the statute of 1806, are those "by which the *armies* of the United States shall be governed;" and the act of 1795 has only provided, "that the militia *employed* in the service of the United States (not the militia *ordered* into the service of the United States) shall be subject to the same rules and articles of war as the troops of the United States;" and this is, in substance, re-enacted by the 97th of the rules and articles of war. It is not, therefore, admitted, that any express authority is given by either statute, that such a Court Martial as is contemplated for the trial of delinquents under the 5th section of the act of 1795, is to be composed of the same number of officers, organized in the same manner as these rules and articles contemplate for persons in actual service. If any resort is to be had to them, it can only be to guide the discretion of the officer ordering the Court, as matter of usage, and not as matter of positive institution. If, then, there be no mode pointed out for the formation of the Court Martial in these cases, it may be asked, in what manner is such Court to be appointed? The answer is, according to the general usage of the military service, or what may not unfitly be called the customary military law. It is by the same law that Courts Martial, when duly organized, are bound to execute their duties, and regulate their modes of proceeding, in the absence of positive enactments. Upon

*Margin notes:*

1827.
Martin
v.
Mott.

It is not necessary that the Court Martial for the trial of delinquents, under the act of 1795, should be composed of the precise number of officers required by the rules and articles of war for the composition of General Courts Martial in the army.

any other principle, Courts Martial would be left without any adequate means to exercise the authority confided to them : for there could scarcely be framed a positive code to provide for the infinite variety of incidents applicable to them.

The act of the 18th of April, 1814, ch. 141. which expired at the end of the late war, was, in a great measure, intended to obviate difficulties arising from the imperfection of the provisions of the act of 1795, and especially to aid Courts Martial in exercising jurisdiction over cases like the present. But whatever may have been the legislative intention, its terms do not extend to the declaration of the number of which such Courts Martial shall be composed. The first section provides, " that Courts Martial to be composed of militia officers alone, for the trial of militia drafted, detached, *and* called forth, (not *or* called forth,) for the service of the United States, *whether acting in conjunction with the regular forces or otherwise*, shall, when necessary, be appointed, held, and conducted, in the manner prescribed by the rules and articles of war, for appointing, holding, and conducting, Courts Martial for the trial of delinquents in the army of the United States." This language is obviously confined to the militia in the actual service of the United States, and does not extend to such as are drafted and refuse to obey the call. So that the Court are driven back to the act of 1795 as the legitimate source for the ascertainment of the organization and jurisdiction of the Court Martial in the present case. And we are of opinion, that nothing appears on the face of the avowry to lead to any doubt that it was a legal Court Martial, organized according to military usage, and entitled to take cognizance of the delinquencies stated in the avowry.

The sentence of the Court Martial, approved by the President, was sufficient, supposing that any approval is necessary.

This view of the case affords an answer to another objection which has been urged at the bar, viz. that the sentence has not been approved by the commanding officer, in the manner pointed out in the 65th of the rules and articles of war. That article cannot, for the reasons already stated, be drawn in aid of the argument; and the avowry itself shows that the sentence has been approved by the President of the United States, who is the commander in

chief, and that there was not any other officer of equal grade with the major generals by whom the Court Martial had been organized and continued within the military district, by whom the same could be approved. If, therefore, an approval of the sentence were necessary, that approval has been given by the highest, and indeed only, military authority competent to give it.

But it is by no means clear that the act of 1795 meant to require any approval of the sentences imposing fines for delinquencies of this nature. The act does not require it either expressly or by necessary implication. It directs (s. 7.) that the fines assessed shall be certified by the presiding officer of the Court Martial to the marshal, for him to levy the same, without referring to any prior act to be done, to give validity to the sentences. The natural inference from such an omission is, that the Legislature did not intend, in cases of this subordinate nature, to require any farther sanction of the sentences. And if such an approval is to be deemed essential, it must be upon the general military usage, and not from positive institution. Either way, we think that all has been done, which the act required.

Another objection to the proceedings of the Court Martial is, that they took place, and the sentence was given, three years and more after the war was concluded, and in a time of profound peace. But the opinion of this Court is, that a Court Martial, regularly called under the act of 1795, does not expire with the end of a war then existing, nor is its jurisdiction to try these offences in any shape dependent upon the fact of war or peace. The act of 1795 is not confined in its operation to cases of refusal to obey the orders of the President in times of public war. On the contrary, that act authorizes the President to call forth the militia to suppress insurrections, and to enforce the laws of the United States, in times of peace. And Courts Martial are, under the 5th section of the act, entitled to take cognizance of, and to punish delinquencies in such cases, as well as in cases where the object is to repel invasion in times of war. It would be a strained construction of the act, to limit the authority of the Court to the mere time of

*1827.*

Martin
v.
Mott.

But it is not clear that any approval was necessary.

A Court Martial regularly organized under the act of 1795, does not expire with the termination of a war then existing.

Martin
v.
Mott.

Discrepancy
in setting forth
the sentence.

the existence of the particular exigency, when it might be thereby unable to take cognizance of, and decide upon a single offence.    It is sufficient for us to say, that there is no such limitation in the act itself.

The next objection to the avowry is, that the certificate of the President of the Court Martial is materially variant from the sentence itself, as set forth in a prior allegation. The sentence as there set forth is, " and thereupon the said General Court Martial imposed the sum of 96 dollars as a fine on the said Jacob, for having thus failed, neglected, and refused to rendezvous and enter in the service of the United States of America, when thereto required as aforesaid." The certificate adds, " and that the said Jacob E. Mott was sentenced by the said General Court Martial, on failure of the payment of said fine imposed on him, to twelve months imprisonment."    It is material to state that the averment does not purport to set forth the sentence in *hæc verba;* nor was it necessary in this avowry to allege any thing more than that part of the sentence which imposed the fine, since that was the sole ground of the justification of taking the goods and chattels in controversy.    But there is nothing repugnant in this averment to that which relates to the certificate.    The latter properly adds the fact which respects the imprisonment, because the certificate constitutes the warrant to the marshal for his proceedings.    The act of 1795 expressly declares, that the delinquents " shall be liable to be imprisoned by a like sentence, on failure of payment of the fines adjudged against them, for one calendar month for every five dollars of such fine."    If indeed it had been necessary to set forth the whole sentence at large, the first omission would be helped by the certainty of the subsequent averment.    There is, then, no variance or repugnance in these allegations; but they may well stand together.

Of the remaining causes of special demurrer, some are properly matters of defence before the Court Martial, and its sentence being upon a subject within its jurisdiction, is conclusive; and others turn upon niceties of pleading, to which no separate answers are deemed necessary.    In ge-

neral it may be said of them, that the Court do not deem them well-founded objections to the avowry.

Upon the whole, it is the opinion of the Court, that the judgment of the Court for the Trial of Impeachments and the Correction of Errors ought to be reversed, and that the cause be remanded to the same Court, with directions to cause a judgment to be entered upon the pleadings in favour of the avowant.

1827.

Martin
v.
Mott.

JUDGMENT. This cause came on, &c. On consideration whereof, it is CONSIDERED and ADJUDGED, that there is error in the judgment of the said Court for the Trial of Impeachments and the Correction of Errors, in this, that upon the pleadings in the cause, judgment ought to have been rendered in favour of the avowant, whereas it was rendered in favour of the original plaintiff; and it is, therefore, further CONSIDERED and ADJUDGED, that the same judgment be, and the same hereby is, REVERSED and ANNULLED; and also, that the judgment of the Supreme Court of Judicature of the State of New-York, which was affirmed by the said Court for the Trial of Impeachments and the Correction of Errors, be REVERSED and ANNULLED; and that judgment be rendered, that the said avowry is good and sufficient in law to bar the plaintiff's action, and that the plaintiff take nothing by his writ; and that the cause be remanded to the said Court for the Trial of Impeachments and the Correction of Errors, if the record be now in the said Court, and if not, then to the Supreme Court of Judicature of the State aforesaid, to which the same has been remitted, with directions to cause judgment to be entered upon the pleadings in favour of the avowant.