*Court of Common Pleas, Dauphin County, November 29th, 1862.*

### COMMONWEALTH EX REL. WENDT v. ANDRESS.

The order of the President of the United States, under the act of Congress conferring on him the power of prescribing the *modus operandi* of calling out the militia, has all the force of an act of Congress. A drafted militiaman, so called out, cannot pay a fine in lieu of service, unless the provost-marshal fails to take him.

BY THE COURT.—The complainant has sued out this writ averring that he is unlawfully deprived of his liberty by being confined in " Camp Curtin " without authority. To this the respondent replies that he holds the complainant as a regularly drafted militiaman, drawn for the service of the United States, and delivered to him as commandant of Camp Curtin, by a provost guard, he being brought in as a deserter. It appears very clearly on the hearing that the complainant never was a deserter, in the ordinary sense of the word, but that when drafted he neglected and refused to attend, and was brought here by the guard.

Two questions have been raised by the complainant's counsel: First. That no provost-marshal was regularly appointed, and, therefore, the guard had no authority to arrest him; and second, that when drafted it was optional with him to attend at the place of rendezvous, or remain at home and pay such fine as should be imposed on him by a court-martial, under the 5th section of the act of February 28th, 1796.

We are not authorized under this writ to inquire into the regularity of the provost guard's action, as the complainant was not in their custody when it was sued out, and the object of the writ of *habeas corpus* is to relieve those unlawfully restrained of their liberty, not to decide on the regularity of the process under which they were seized, unless possibly in the case of an abuse of the court's process which issued the writ. · If the complainant is in the lawful custody of the respondent, we have no right to inquire how he came there, whether voluntarily, or by compulsion; the only question for us to determine is, is he *now* unlawfully restrained of his liberty? We have nothing to say as to the action or power of the provost guard.

Has a drafted militiaman the option to pay a fine or serve his tour of duty? To determine that he had such choice and can escape personal service by paying a fine not exceeding ninety-six dollars, under the act of 1796, would be to destroy the whole service and render the draft abortive. It might, under many circumstances, and even under those now existing, lead to the subjection of the country and subversion of the government. Nevertheless, if Congress, through its negligence, has failed to provide any other means than that found in the law cited to oblige the citizen-sol-

[Commonwealth ex rel. Wendt *v.* Andress.]

dier to perform his duty, he has the legal right, however it may conflict with patriotism, to escape the service, and pay, in its stead, the small pecuniary penalty.

As we understand the act of Congress of February 28th, 1796, it by no means leaves it optional with the militiaman regularly called into service to pay a fine or perform his duty. On the contrary, we consider that the fine was intended to be imposed, at the option of a court-martial as to the amount, in those cases where personal attendance from any cause could not be enforced, making it low where it arose from involuntary causes, and higher when from perversity; and the penalty is not only to be imposed for non-attendance, but for failure to obey any order of the President under that act. If the person of the militiaman can be seized and brought to the rendezvous, he is mustered into service and becomes at once subject to the articles of war and the ordinary military control. If he evades seizure, or escapes from the service before being mustered in, and cannot be retaken, or if he is unable to attend at the place of rendezvous from physical disability, his case is to be heard by a court-martial, and be fined more or less or excused at the discretion of the tribunal.

It is true that Mr. Justice Story, in his dissenting opinion in the case of Houston *v.* Moore (6 Wheaton, 1), says, that the drafted soldier has it in his power to attend or is subject to a fine. Yet the point did not arise in the case, and what is there written must be considered an *obiter dicta*. From the reasoning of the same learned judge in Martin *v.* Mott (12 Wheaton, 19), we can collect the following positions: That the President of the United States must judge when the exigency arises for calling out the militia of the respective States to enable him to see that the laws are faithfully executed, and is incident to the duties of superintending the common defence, and watching over the internal peace of the republic. That the right to enforce the attendance is an incident to the right to call, and the whole is a military power to be carried out by the head of the nation as commander-in-chief. But we are of the opinion that this case does not turn on the proper construction of the act of 1796, but on that of 1862; providing for drawing the militia to serve for a period not exceeding nine months, and conferring the power upon the President to prescribe the *modus operandi*. Under the authority of this act was issued army order No. 99, in which the whole method of selecting, drawing, and enforcing the attendance of the militia of the respective States was pointed out.

This order having been authorized by the act of Congress, must be considered as having all the force of a law, the same as if specially set forth at length in the act, and it prescribes a special method of enforcing the presence of the drafted men at the place of rendezvous directed to be fixed by the governors of the respective States. One provision of the order is, "Provost-marshals

will be appointed by the War Department in the several States on the nomination of the governors thereof, with such assistants as may be necessary to *enforce* the attendance of all drafted persons who ·shall fail to attend at the place of rendezvous." If this provision had been embodied in the act of 1862, which is supplemental to the former law, it could scarcely be pretended that personal attendance by the party drawn or his accepted substitute was not. contemplated, or that he had an option to pay a pecuniary mulct in lieu thereof at his option, and the validity of the whole enrolment and draft depends on that order.

I .am clearly of the opinion that the order is valid, and must have the force of an act of Congress, that the attendances of drafted men at the places of rendezvous may be enforced in the mode prescribed, and · that when drawn they have no option to pay money or render service, but may be obliged to perform the latter. But ·should the provost-marshal fail to bring the men to the place of rendezvous, then the fine may be imposed by a court-martial under the act of 1796, and this, according to the cases already cited, may ·be forced even after peace is determined. It is ordered that John Wendt be remanded into the custody of the officer in command at Camp Curtin, as a regularly drafted militiaman.