## School District No. 6, in Dresden, *versus* Ætna Ins. Company.

By R. S., c. 11, § 22, a school district, at any legal meeting called for the purpose, shall have power " to sell and dispose of any school-house or other property, if necessary."

A school district is the exclusive and final judge of the necessity of a sale of its school-house.

If a school district would rescind a sale of its school-house, on the ground of fraud between its selling committee and the purchasers, it must at least offer to restore to the purchasers what was received from them. *Semble.*

On Exceptions.

Assumpsit upon a policy of insurance against fire.

A few years prior to March, 1860, school districts numbered three and six, in Dresden, united under the statute and formed the plaintiff district, when it became designated as school district number six. On March 1, 1860, this school district effected a policy of insurance of $1000, for the term of one year, with the defendants, upon its school-house, built after the formation of the district and known as the

School District No. 6, in Dresden, *v.* Ætna Insurance Co.

new school-house. April 1, 1861, the policy was renewed for one year, no new representation having been made.

But, at a legal meeting, held June 4, 1860, the district, under the article, — " To see if the district will vote to sell the new school-house therein, and pass any votes necessary to accomplish that purpose," voted " to sell the new school-house," and that " Ephraim Alley, Edward Lawrence and Seth H. Whitcomb be a committee to sell" it.

This committee advertised for written proposals to purchase, received one, but did not sell. Subsequently, on July 12, 1860, they advertised a second time, giving a week's notice, by posting notices in three public places in the district, inviting similar proposals, announcing the terms to be " ten per cent. down, the balance in one year, with good security, and interest, sale positive to the party making the best offer." Three written proposals were received, one for " $350 for house, woodshed and all fixtures ;" another for " $10 over and above any offer" the committee "have had or may have up to the time notified for receiving proposals," &c. ; and the third, for $388, signed by Charles Bickford and Seth C. Houdlette. This last proposal was accepted by the committee, and the same day the committee, upon the receipt of ten per cent. cash and notes for the balance, executed and delivered to Bickford and Houdlette a bill of sale of the new school-house, who, in August following, took possession of, and removed the school-house to an adjoining lot owned by them, where it remained unoccupied until May 11, 1861, when it was destroyed by fire.

The plaintiffs alleged fraud and collusion between the purchasers and the committee. They also contended that the sale was not " necessary," claiming that these questions should be passed upon by the jury. The jury found specially that " it was not necessary that the plaintiffs should sell and dispose of the school-house; and that, in the sale and purchase of it, " there was fraud and collusion between the purchasers and the committee."

School District No. 6, in Dresden, *v.* Ætna Insurance Co.

The instructions are sufficiently stated in the opinion and dissenting opinion.

The defendants excepted.

*A. P. Gould,* for the plaintiffs.

School districts are bodies *quasi* corporate for a certain purpose, and with certain definite and very limited powers. Their powers are limited to express grant. Cannot hold and dispose of property generally, nor tax their inhabitants for general purposes. Can acquire and hold property only for educational purposes. R. S., c. 11, § 15. Hold property of the inhabitants *in trust,* for the purposes of education ; and, if the trustee attempts to divert the trust fund or property, the Court will restrain him, and treat the attempted transfer as a nullity. If A is seized to the use of B, with authority to convey in a certain contingency, a legal sale could not be made by A upon the mere pretence that the contingency had happened. The validity of the sale would depend upon the occurrence of the contingency in fact. No decision of the trustee himself can preclude the *cestui que trust* from inquiring into it. School districts are under no liability to the inhabitants for the dishonest administration of their trust, and the only mode of protecting the interests of *cestuis que trust* is to declare the attempted perversion of the trust null and void.

The purchaser of school district property is bound to know that it is held for a certain purpose ; and, when he sees the purpose violated, and a manifest fraud committed upon the law, and upon the inhabitants of the district, he can acquire no title by the purchase.

A majority cannot oppress a minority by a sale or misappropriation of the property of a school district. Each inhabitant is an owner in the district property, and no action of the majority can take the property except in aid of education. It can be sold only when *necessary* for the purposes of education. The statute does not authorize a district to sell whenever it pleases, but when it " is necessary." This

School District No. 6, in Dresden, *v.* Ætna Insurance Co.

sale was to hinder and not promote education. Counsel cited *Whitmore* v. *Hogan*, 22 Maine, 564, 568—9. Counsel elaborately argued question of fraud between committee and purchasers.

*Wales Hubbard*, for the defendants.

APPLETON, C. J.—The school district number six, composed of the previously existing school districts number three and number six, effected a policy on their school-house with the defendant corporation, dated March 1, 1860, for the term of one year.

At a legal meeting of this district on the fourth of June, 1860, it was voted to sell the school-house, and a committee was appointed for that purpose, by whom a sale was made on 19th July, 1860, and the purchasers immediately took possession of the building and removed the same to a lot owned by them.

On the first of April, 1861, the plaintiffs effected a renewal of the policy to which we have referred.

On May 11, 1861, the school-house was burned, and this suit is brought upon the renewal to recover compensation for the loss.

If a school district has authority to sell its school-house, and finally to determine the necessity of such sale, and if, in pursuance of such authority a sale has been made, the plaintiffs would have no insurable interest in the school-house. The simple inquiry, then, seems to be whether a school district has a right to do what it pleases with its own.

In the action of corporations, the controlling principle is that the majority must govern,—the majority of those present and voting,—not of those absent or present and declining to vote. The will of the majority is to be taken as the will of all. It is immaterial whether the vote be unanimous, or with a mere majority of one, the result is the same. In either alternative it is the conclusive determination of the corporation. It is immaterial, too, what may have been the

motives of the opposing voters,—all a court can regard is the ultimate conclusion as expressed in and by the record.

By R. S., 1857, c. 11, § 22, "a school district, at any legal meeting called for the purpose, *shall have* power :—

"First,—To raise money for erecting, repairing, purchasing and removing such school-houses and out buildings *as the wants of the district require;* for purchasing or renting land for them to stand upon, and for yards and play grounds ; for purchasing a library, utensils, blackboards, globes, maps and other useful apparatus ; for providing water for school-houses by means of wells or aqueducts, with necessary conveniences for the health and comfort of teacher and pupils ; and for inclosing the grounds and appurtenances of the school-houses.

"Second,—To determine where their school-houses shall be located.

"Third,—To sell and dispose of any school-house or other property, if necessary."

School districts may raise money for certain purposes, "as the wants of the district require,"—in other words, as the district may deem necessary. They may furnish "*necessary* conveniences for the health and comfort of teacher and pupils." No right of appeal from their judgment is given. What that judgment may be is to be ascertained only by the votes of a majority and, when thus ascertained, it is conclusive. It is not for a jury to say what "the wants of the district require," or what may or may not be "necessary conveniences." No limitation is imposed upon the district as to the exercise of its judgment in respect to the matters over which it has full power to act.

The question was submitted to the jury to determine whether it was necessary for the plaintiffs to make sale of the school-house in controversy, to which they responded, it was not. But the matter of necessity was a fact for the district to consider and settle, and not the jury.

School districts "have power * * to sell and dispose of any school-house or other property, *if necessary*." The term

necessary has relation to the state of mind of the person by whom it is used. The same thing may be viewed as necessary by one and as unnecessary by another. The conveniences in a school-house necessary,—and so regarded in one place, would be viewed as unnecessary in another. The "wants" of one district may "require" much more than those of another. A school-house which one district would deem it "necessary" to sell, might be amply sufficient for and satisfactory to another differently situated. So, the majority of a district may deem the sale of a school-house "necessary," while the minority entertain different and conflicting views. The words "necessary" and unnecessary express only the different states of mind of opposing parties in reference to one and the same act,—and that act is made by law to depend upon the votes of a majority.

The district own their school-house. The voters are interested in the most judicious disposition of its property. They know the present necessities as well as the future wants of the district better than strangers possibly can. Besides, the matter is their business and nobody's else.

If the district is not the exclusive and final judge of the necessity of a sale of its property,—whatever it may be, then it cannot "sell and dispose" of its property, because it cannot give a perfect title. Its action is only tentative and experimental. The purchaser can at best get but a defeasible title. If the jury are the final judges of this necessity, a lawsuit and a verdict are indispensable prerequisites to ultimately determine the validity of a sale by a school district of any of its property.

The same power exists to sell a school-house as to sell an old stove or table, and if the district cannot finally determine the necessity which would require the sale of the former, neither can they of the necessity which would justify that of the latter.

The power to sell is given absolutely. That includes the right to determine the questions,—shall there be a sale,—is it necessary to sell. The district has full power to deter-

mine when to build or buy a school-house. It has none the less to sell or dispose of the school-house it may have built or bought.

The phrase *if necessary*, in article third, is to have the same effect as the expression in article first, "as the wants of the district require," or as "if they think proper," in the fifth article of § 22. In all these, as well as in many analogous instances, the judgment given by the party, to whose action reference is had, is final and conclusive on all.

By R. S., 1857, c. 3, § 26, "the qualified voters of a town, at a legal town meeting, may raise such sums as are *necessary* for the maintenance and support of schools, and the poor; for making and repairing highways, townways, bridges, &c., &c. ; and for other *necessary* town charges."

By § 27, towns, cities and village corporations may make such by-laws as they think proper, not inconsistent with the laws of the State, and enforce them by suitable penalties," &c.

Now are not the qualified voters of a town at a legal town meeting to determine what sums are *necessary?* Is not their judgment, whether by a larger or smaller majority, conclusive as to the amount to be raised to meet the *necessary* town charges? Is the validity of an assessment to be submitted to the judgment of a jury and to be held void because the jury should happen to differ in opinion from the majority of the qualified voters as to the necessity of the sums voted to be raised? The town could not contract, its municipal action would be suspended, if it were not permitted to be its own judge of the amount needed for roads, bridges, schools and other necessary town charges.

So the by-laws of towns and cities would be of little avail, if their propriety were to be submitted to a jury. One jury might find their propriety by their verdict, while in the judgment of another, they might be deemed improper. The opinion of those to whom the power is specially entrusted, would be set at naught.

The school district may raise money for erecting, repair-

ing, purchasing or removing a school-house " if the wants of the district require," &c. But, if the district is not the ulti-mate judge of its wants, but there is an appeal to a jury, who are to determine what its wants require, then the ulti-mate judgment is by the jury and not by the district. If the jury differ from the district, then the assessment is void, the contract, based upon such assessment and its antici-pated collection would be void, because the district can only build or buy such a school-house as its wants require, and, as the jury will have decided that its wants did not require what the voters of the district voted they did require, and as they are not allowed to be judges of their own wants, the contract based upon the hypothesis that they were to determine what the wants of the district required could not be upheld.

The power given in these and numerous other instances must be exercised. There are duties to be performed, the performance of which can neither be avoided nor evaded. The town would be liable to indictment if it should neglect to make due provision for the performance of the various duties imposed by statute. So far as regards the inhabi-tants of a town or school district, the vote of the majority, as to a matter over which they have jurisdiction, is conclu-sive, though, as regards the rights of the State, it may be otherwise.

When a power is to be exercised upon a certain contin-gency, and the existence of such contingency is submitted to the judgment of an individual or a corporation, their deter-mination that the contingency has arisen is final and con-clusive. Thus, the Legislature of Maryland, when incorpor-ating the Mayor and City Council of Baltimore, gave the corporation full power and authority " to enact and pass all laws and ordinances necessary to preserve the health of the city, prevent and remove nuisances," &c., within certain limits. In commenting upon one of the ordinances of the corporation, passed in pursuance of this power thus confer-red, DORSEY, J., in *Harrison* v. *Baltimore,* 1 Gill., 276,

says,—"To accomplish, within the specified territorial limits, the objects enumerated, the corporate authorities were clothed with all the legislative powers, which the general assembly could have exerted. Of the degree of necessity for such municipal legislation, the Mayor and City Council of Baltimore were the exclusive judges. To their sound discretion was committed the selection of the means and manner (contributory to the end) of exercising the powers which they might think requisite to the accomplishment of the objects of which they were made guardians." So, "whenever a statute gives a discretionary power to any person," observes STORY, J., in *Martin* v. *Mott*, 12 Wheat., 31, "to be exercised by him upon his own opinion of certain facts, it is a sound rule of construction, that the statute constitutes him sole and exclusive judge of the existence of those facts." Where, by the terms of the power, the executors are to sell if, in their opinion, it shall be necessary for the purpose of paying debts and legacies, the necessity need not be shown, the conveyance being conclusive. *Roseboom* v. *Mosher*, 2 Denio, 51. "It does not seem necessary to inquire into the reasons which actuated the Mayor, Aldermen and Commonalty of the city of New York, in adopting it, (a certain ordinance regulating the running of cars in the city,) nor would such inquiry be proper, because the courts are bound to assume that, when a discretion is vested in a municipal body, exercising functions of a legislative character, good reasons existed for the adoption of a regulation or ordinance which was the result of such discretion." *N. Y. & Harlem Railroad Co.* v. *Mayor, &c. of N. Y.*, 1 Hilton, 562.

These are general principles. Their application has been enforced in cases like the present. In *Williams* v. *School District in Lunenburg*, 21 Pick., 76, the plaintiff claimed to recover back a tax assessed to pay for a school-house. He "offered evidence to prove that another school-house of brick had been erected by the district but a short time before the one for the payment whereof the tax was assessed,

which was sufficient to accommodate all the scholars, and offered to introduce witnesses, inhabitants of the district, who would give it as their opinion that the brick house was all the district required, and that one school-house was all the district intended to have. But the Judge refused to admit the evidence," and directed the jury to return a verdict for the defendant, to which the plaintiff excepted. In delivering the opinion of the Court, SHAW, C. J., says,— " The plaintiff offered to prove that the district had one sufficient school-house, but the evidence was rejected. We know of no law which prevents a school district, when their school-house is, *in their opinion,* too small or ruinous, or when, by a change of districts, a school-house, though within the limits of the district, is in an inconvenient situation, or when, for any other cause, it is unfit for the purposes for which a school-house is intended, to vote to build another before the former is actually taken down." If the evidence offered had been proper for the jury, the exceptions most manifestly should have been sustained. In *Spaulding* v. *Lowell*, 23 Pick., 80, the action was to recover back a tax assessed to pay for a market-house. It was objected, among other grounds, that the house was larger and more expensive than was necessary. " As to the size and other circumstances of the building," observes SHAW, C. J., " if the accomplishment of the object was within the scope of the corporate powers of the town, the corporation itself was the proper judge of the fitness of the building for its objects, and it is not competent in this suit to inquire whether it was a larger and more expensive building than the exigencies of the city required." Accordingly a nonsuit was ordered. In *Haven* v. *Lowell*, 5 Met., 35, a bill in equity was brought to compel the specific performance of a contract to purchase land for a market-house, which the city had made, but refused to perform, on the ground that the land was not necessary for the purpose contemplated by the city. The Court refer to the decision in *Spaulding* v. *Lowell*, approve it and hold that whether necessary or not

was a question for the city to determine, and, having so determined, the contract was held valid and a decree entered for its performance. In *George* v. *School District in Mendon*, 6 Met., 510, an action was brought to recover back a tax assessed for building a school-house. The objection was taken that the house and site were more expensive than necessary. "We cannot," remarks SHAW, C. J., in delivering the opinion of the Court, "take into consideration various other objections, turning upon the question whether the site of the house was a good one; whether the contract was beneficial or judicious, &c.; these were questions for the consideration of the district, to be determined according to their view of their wants of a school-house and its incidents and are entirely within their jurisdiction."

These authorities seem to establish the proposition that, when an act is within the scope of a corporate power, the corporation are the exclusive judges of the necessity of the act and of the means to accomplish it, as between the corporation and its members.

The argument from the possible abuse of a power proves nothing against its existence. The district may err in their judgment as to their wants and the best means of supplying them. But a jury is not infallible, and they too may err. It is difficult to conceive of a power the exercise of which is not susceptible of abuse, but it by no means follows that, for that cause, the power does not exist, or that there should be an appeal from one fallible tribunal to another, at least equally fallible, to correct the possible mistakes of the former or to commit greater ones.

The district had power to build, or purchase, or to sell what had been built or purchased, and to determine the necessity of doing the one or the other. If it cannot determine the size and general form of the structure to be built and raise money to pay for its erection, then no one can safely contract with it, for a jury, accidentally assembled by lot, may differ in judgment, as to the size and cost of the building, and vacate the whole proceedings. So, it may

vote to sell. The purchaser has nothing to do with the district and is not responsible for its action. He finds a duly recorded vote to sell, passed at a legal meeting, upon the strength of which he purchases and pays the price, and removes the building. Is his purchase to be null because a jury happen to differ in judgment from a majority as to the necessity of a sale by the district? If such be the law, it is manifest that the price of a school-house, to be purchased or built, will be increased, or, if to be sold, will be diminished, from the uncertainties in case of controversy, as whether a jury will concur or non-concur in judgment with the district.

In certain ·instances the power of the district is not nor was it intended to ·be final, and special provision is made for an appeal from its decision to that of the town, as in § 24, where, in case a majority decline raising a sum of money sufficient in the opinion of the minority, they may have, by their appeal, the judgment of the whole town. So, in case of a disagreement as to the location of a school-house, provision is made by § 27 for a tribunal to settle the controversy. By § 30, the plan for a school-house is required to be approved by the superintending school committee.

When the Legislature do not intend that the action of the district should be final, they give the special right of appeal and not otherwise. But no supervisory power is given to control, — no appellate jurisdiction is granted to correct the doings of a district in reference to the purchase or sale of its own property. It is much more consonant with our institutions that corporations as well as individuals should be allowed to dispose of their property according to their judgment of the necessity and expediency of so doing, — rather than to leave the question to that of any other body of men, howsoever constituted.

In fine, it is for the district to determine whether or not the necessity exists for a sale of its property. Of this necessity they are the conclusive and most fitting judges. The vote of a majority is the legal expression of that judgment.

School District No. 6, in Dresden, *v.* Ætna Insurance Co.

It follows, that the submission of the necessity of the sale to the jury was erroneous, and that they were required to pass upon a question with which they had nothing to do. The evidence relating to the greater or lesser degree of necessity of such sale should not have been received. The district having acted wisely or unwisely,—the jury, upon evidence of those who voted for or against the sale, should not have been permitted to overrule and nullify the action of the district and determine how they should have voted.

But the jury, it is argued, have found the sale fraudulent on the part of the school district. But there is no pretence of any fraud, save that inferrible and deducible from an alleged want of necessity to sell. The majority of the district voted to sell. The jury think it was not necessary to sell,— and, from that solitary premise, infer fraud. But, if the right to buy, build or sell school-houses was a matter left by statute to the discretion of the district, it is difficult to see how there can be fraud on their part in doing or refusing to do what the statute gives them the power to do or refrain from doing. Their action may be unwise, injurious or inexpedient, but folly, lack of judgment or want of expediency do not constitute fraud.

It is equally difficult to maintain the proposition that a corporation by its own vote can defraud itself. It may be defrauded by others, but, that it can, by its own vote, commit a fraud upon itself, is sheer nonsense.

If the corporators have been wronged or defrauded, they must seek a remedy by such process as the law affords them, but this case presents the astounding novelty of the party seeking to avoid his act on account of his own fraud.

If there has been any violation of any law of the State, the State must proceed according to the recognized mode of procedure. But neither the State nor the corporators invoke the aid of any law or complain of any violation.

The plaintiffs' claim is not aided by the alleged fact that its conduct was fraudulent and in contravention of the object and purpose of the law which provides for the education of

the people. An individual is not allowed to rescind a sale made by him in fraud of his creditors, and base his right of rescission upon his fraudulent conduct. The claim of the district is strong only in the direct proportion of its violation of the objects and purposes of the statute.

If the sale was fraudulent, — with intent to evade the statute and in hostility to great objects of education, still, the district did vote to sell, — a sale was made, — possession taken under that sale, — and the price paid.

The presiding Judge instructed the jury "that the plaintiffs cannot predicate their right to recover in this action on its own want of good faith in voting to sell the school-house or in making sale thereof in pursuance of such vote." If this be law, it is difficult to see on what grounds the plaintiffs can recover, for they constitute the only substantial foundation of their claim.

If a sale is voidable on account of fraud, the party defrauded cannot rescind the sale without placing the party by whom he was defrauded *in statu quo*, or offering to do it. The law cannot be deemed more lenient to the party by whom the fraud is committed. Here, if there be any fraud or violation of law, the plaintiffs are those committing the fraud or violating the law. If therefore they would rescind the sale, they would seem to be bound at least to tender the notes and money received, in other words, to do what is required in cases of rescission.

The district having given authority to sell and a sale having been made in pursuance of such authority, by its legally constituted agent, and the purchasers having taken possession of the school-house, if the district have not rescinded the sale, if it was made under such circumstances as gave it the right of rescission, the renewal of the policy would be void for the reason that district No. six had no then existent title to the property insured.

A sale had been made. If valid, the sellers, after the sale, had no insurable interest. If voidable, the title none the less

passed and, before it could be reacquired, there must be a rescission of the contract of sale.

No rescission is shown. The vote of District No. 6, on 19th March, "to put the new school-house back on the old spot," would not constitute a rescission. The district, by its legal agent, had ten per cent. of the price of the school-house in money and the notes of the purchasers. These have neither been returned nor had they been offered to the purchasers prior to the pretended renewal of the policy.

There had been a change of title between the date of the original policy and the alleged renewal, which was not disclosed to the insurers. This, by the very terms of the policy, rendered it void. It is immaterial to the then defendants whether the sale was valid or voidable. In either event there was a change of title, and none the less a change though the sale may have been made under a state of facts which would have authorized the seller to rescind the sale.

*Exceptions sustained — New trial granted.*

CUTTING, WALTON and DICKERSON, JJ., concurred.
TAPLEY, J., concurred in the result.
DANFORTH J., having been of counsel, did not sit.

BARROWS, J., dissenting. — This action of Assumpsit upon a policy of insurance is defended upon the following alleged grounds : — 1. *That* the plaintiffs had no insurable interest, estate or title, in and to the school-house which was the subject of the policy : — 2. *That*, previous to a renewal of the policy under which the plaintiffs claim, in pursuance of a vote of the district, a committee thereof had made a bill of sale of the school-house and delivered it with the building to the purchasers, who had removed the building on to an adjoining lot and caused it to be insured in their own names, and that they had possession of it as an unoccupied building at the time of the fire ; *that*, by the transfer and removal, the risk was changed, and the same not having been made known to the company, they cannot be held liable under the renewal for the loss.

The case has once before been before the Court, and a verdict for the plaintiffs was set aside and a new trial granted, because the instructions of the presiding Judge, as reported in the exceptions, might have been construed by the jury as requiring them to find that a change of risk, to relieve the defendants from liability, must have been caused *by some act of the district.*

A second trial has resulted in a similar verdict, and the case has come up on exceptions to the rulings and instructions of the presiding Judge, and also upon a motion to set aside the verdict as contrary to law and the evidence in the case.

Besides the general verdict for the plaintiffs, the jury found specially, in reply to separate interrogatories propounded to them in writing, — *that* it was *not necessary* that the district should sell and dispose of the school-house at the time of the sale to Bickford and Houdlette; *that*, in the sale and purchase of the school-house referred to, there was fraud and collusion between the purchasers and the committee who assumed to act for the district; and *that* the risk was not changed after the original representation, and at the time of application for renewal, either within itself or by the surrounding or adjacent buildings.

In support of the exceptions, the first ground taken by the counsel for defendants is, that the instructions were erroneous respecting the right of the district to sell the house. Upon this point the instructions were, that the right was qualified or limited by adding the words "if necessary" to the clause of the statute conferring the power, —*that* a reasonable and liberal construction must be given to these words of limitation, —"they do not require that a case be made out of absolute necessity, or that the house should have become utterly ruinous." By way of illustration of the necessity referred to and which might authorize a sale by a district acting in good faith and intending to advance the cause of education, various cases were put, among which, inconvenient location was one. The jury were further in-

structed that, "of the necessity contemplated by the statute, the district must in the first instance judge and determine, and that decision must stand and be binding unless it is made to appear that no such necessity existed, — that it must appear that the sale was in fact a fraud upon the law, an arbitrary act of power manifestly intended not to be in furtherance of the cause of education, but for an ulterior purpose of hindering or obstructing the maintenance of schools by depriving the district of any suitable place for its schools or other like purpose, by which the proper education of the children of the district would be prevented or embarrassed without any countervailing good, — it must be a case of bad faith, abuse of the power given, not a mere mistake of judgment, where it was obvious that an honest difference of opinion existed as to what was best, having fairly in view the interests of education," and the presiding Judge left it with the jury to determine, under these instructions, whether the sale was *valid* within the statute which authorized it "if necessary."

It is obvious that the defendants could have no cause to complain of instructions thus carefully guarded, unless it was erroneous to allow the jury to pass upon the action of the district at all. Accordingly it is contended that the judgment of the district must be conclusive, and that the Legislature did not intend to deprive school districts of the right to decide finally respecting the necessity of sales of their property, or to introduce the uncertainty of title as to any property once held by a school district, which must result from allowing their decisions to be revised, "especially by so unsuitable a tribunal as a petit jury."

From among the voters in the various towns, who are also the voters in the school districts, an official board in each town is required by law to prepare a list of such persons of good moral character as they shall judge best qualified to serve as jurors.

These lists are subjected to the approval of the voters in

the several towns, who may strike out such names as they think proper, in open town meeting, by a majority of the legal voters present, but not add any. From these lists traverse jurors are indifferently drawn. They are purged of all partiality and prejudice and sworn to decide the issues committed to them according to the law and the evidence. The unanimous concurrence of twelve men, thus selected, is necessary to a verdict. Not claiming infallibility for their decisions, I am still of the opinion, that the determination of questions of fact may, with tolerable safety, be entrusted to such a tribunal, under proper instructions from the Court as to matters of law, especially when a party who considers himself aggrieved by their doings may have them revised by the highest tribunal known to the laws of the State, and reversed if found unsupported by the testimony in the case, or manifestly founded on prejudice or misconception. Issues of life and death are sometimes in their hands. They can hardly be considered "an unsuitable tribunal" to determine, under the law, upon the validity of the sale of a school-house where it comes incidentally in question. They are composed of the more intelligent portion of the class to which the voters in the school district belong, and they are called to pass upon the same question *without any pecuniary or partisan interest in the result.*

But it is argued that, because a ready method of revising the doings of a school district is provided in certain cases, by an appeal from a majority of a district to certain tribunals, which are authorized to decide finally upon the matters in controversy, therefore, where no such tribunal is provided by statute and no such ready appeal given, the doings of the majority must be deemed conclusive. Are they not then subject to revision and correction by some power, when it is evident that they were unauthorized by law? It does not follow that, because the Legislature may have provided for a speedy decision, by a statute tribunal having final jurisdiction in certain cases, where prompt and decisive action is essential to the prosecution of the object for which these

corporations have an existence, therefore the minority of a district are left at the mercy of an irresponsible majority in *other* matters.

Questions as to the *amount* of money to be raised for a purpose for which a district has legal power to raise it,— as to the location or proposed removal of a school-house,— as to a plan for the erection or reconstruction of a school-house, must, when practicable, be speedily decided, and not await the slow progress of litigation in the courts, and the Legislature have provided that they may be submitted to appropriate tribunals outside the district, whose decisions may ordinarily be expected to be impartial and satisfactory. But it can hardly be conceded that the fiat of these tribunals, even, is irreversible, if found to be tainted with fraud and in gross and palpable violation of the duties, interests and objects for which the power was conferred. That a factious, penurious or vindictive opposition to the will of a majority acting in good faith, with a view to the furtherance of the objects for which the school district was created, can gain no encouragement from instructions such as were given in this case, is too plain to need elucidation or remark.

The validity of the sale is not made to depend upon the existence of an error in judgment as to the expediency of the proposed act, but upon that of a design to defeat the end for which alone the district was clothed with any power in the premises.

It is further argued that, inasmuch as the same statute limitation applies to sales by a school district of other property of which they may be possessed, the Legislature could not have intended that the purchaser's right to articles of even trifling value should depend upon the verdict of a jury as to the necessity of the sale. The argument is not sound. The language of the statute is explicit. The words "if necessary," are not tantamount to "if they think proper," elsewhere used, but impose a clear and distinct limitation upon the power of sale, and the necessity must be determined by the same tribunal which is called to pass upon the

validity of the sale. Purchasers in these, as in other cases, must take the risk of the rights of their vendors, and the buyer acquires no greater rights than the seller can legally convey. Various contingencies may demonstrate that a sale of any property by any corporation or individual is either void or voidable, as a jury may find the facts upon which its validity depends, but we do not look upon them as introducing any uncertainty of titles that can operate as a serious check upon legitimate business.

Neither does the fact that other remedies exist for a minority whose rights may be invaded by the illegal acts of a majority of the district, at any meeting thereof, make any difference here. A question arose incidentally in this case as to the validity of an alleged sale. It was submitted to the only tribunal which was competent to pass upon the facts, under instructions quite sufficiently favorable to the defendants, and, if the evidence warranted the jury in finding, as they were required to do, that the attempted sale was an arbitrary act of power, manifestly *intended* not to be in furtherance of the cause of education, but for an ulterior purpose of hindering or obstructing the maintenance of schools, by depriving the district of any suitable place for its schools, or other like purpose, by which the proper education of the children of the district would be prevented or embarrassed, the defendants have no cause of complaint, for the attempted sale was *simply void,* — *no title passed by it,* — the district retained its insurable interest in the school-house, and the first ground taken in defence of the action fails. But the counsel argues that this is depriving the purchasers of their property by a judgment, in a suit to which they are not parties. By no means. If they are not parties nor privies to the suit they are not bound by the judgment.

Complaint is also made of the instructions upon the question of fraud and collusion, between the committee who assumed to make the sale of the school-house and the purchasers, and a large portion of the ingenious and elaborate argument for the defendants is devoted to these matters. But

it is plain that, if the attempted sale was unauthorized by law and void, because the necessity contemplated by the statute did not exist, any question whether or not, if the district could have made a sale otherwise legal, *this* sale was voidable by the district because of fraud and collusion between the purchasers and the agents of the district, and was in fact repudiated by the district, became entirely immaterial. Error in instructions upon this point, if there were any, could not have injured the defendants.

It is further objected that the special interrogatory propounded to the jury confined their inquiry as to the necessity, to the time of the sale to Bickford and Houdlette. But the jury could not have failed to understand, seeing the nature of the matters they were directed to consider in determining as to the necessity, that the time of the *vote* to sell was included in the phrase "at the time of the *sale* to Bickford and Houdlette."

Again, it is urged that, because the policy declares the insurance to be void in case of any transfer or change of title, the defendants are not liable. But here were neither. The acts of Lawrence and others, *assuming to act for the district, being unauthorized by law*, if the special finding of the jury that the sale was not necessary be sustained, were simply inoperative and void. What they did could have no more effect upon the title than as if one man were to undertake to transfer or change the title of another's land by executing a deed in his name without any authority therefor.

Was the finding against law or evidence on the question of necessity? School districts are invested with certain *limited powers*, to be exercised only with an eye to the advancement of the object for which such corporations are created, the education of the youth in public schools, to which all shall have access. That object is dear to all who truly love our country and its institutions. No sordid or vindictive spirit can be permitted to interpose any unlawful impediment to its advancement. Honest but mistaken zeal may err as to the measures best calculated to promote it and we

can afford to wait till experience corrects the error.  But acts which are manifestly designed to defeat the end for which the district was created and to embarrass the operations of the schools, by depriving them of suitable existing accommodations, without any apparent countervailing good, from which it might be inferred that the *motive* was right, even if the acts were ill advised, must be held to be "in fraud of the law," and entirely beyond the scope of any authority conferred by it.

Here, two adjoining districts, large in territory, but having the bulk of their population at their contiguous extremities, had united under the Act of 1852, c. 243, (R. S. of 1857, c. 11, § 26,) and formed one district for the purpose of supporting a system of graded schools.  They had recently erected, at an expense of $1500, a convenient schoolhouse, commodiously located for the district as a whole. There was no other suitable place for the schools within the limits of the district.  A committee, *assuming* to act for the district, negotiate a sale of this new building for about one-fourth of its cost.  The only legitimate motive that is now suggested in argument, is, that a few families lived at an inconvenient distance from the new school-house.  That this was merely specious, is shown by the uncontradicted testimony that a part of the families who lived at the greatest distance were in favor of the new system, and that most of those opposed to it had no children.  And the man who appears most active in bringing about the sale testifies that the object was to divide the district, that that was *his* object. The jury seem to be justified in finding that the movement for a sale had no legitimate object, but was hostile to the interests of education and designed to thwart the extension of the superior advantages of a system of graded schools to the children of the district, and that the attempted sale was therefore not necessary nor valid in the eye of the law.

The truth of the finding that "the risk was not changed either *within itself* or by the surrounding or adjacent build-

ings," between the time of the original representation and that of the application for renewal, is more questionable.

The risk may be changed *within itself* by other matters besides a mere mechanical or material alteration of the building, although the context, "or by the surrounding or adjacent buildings," would seem to favor the other interpretation of the stipulation. But how far the existence of adverse claims to the property, not known to the insurers, ought to be permitted to affect the right of the real owner to recover his insurance in case of loss, need not be discussed here. It may be that such claim, however unfounded, and the fact that the building was not regularly occupied, did enhance the risk. It may be that, had the question been submitted to the Court for determination, they would have come to a different conclusion from that to which the jury arrived. It was however a question for the jury, and two juries have found at different trials of the case, under careful instructions from the Court, that there was no material change of risk. The removal of the building was but a few feet on to an adjoining lot, not more exposed by reason of surrounding buildings than the previous location. There is uncontradicted testimony that the agent of the Insurance Company was informed, at the time of the application for renewal, that the building had been removed and that there was trouble in the district. Upon the whole, we are not satisfied that law and justice require that the case should be sent to a third trial on account of error on the part of the jury.

KENT, J., concurred.