In the matter of Robert Martin.

---

## SUPREME COURT.

### *In the matter of* ROBERT MARTIN.

A person arrested and detained upon an *order* from the war office at Washington, by authority of the President, directing "Robert Martin to be transferred to General Hooker for trial," will be discharged on *habeas corpus*, where from the return it appears that he is charged with the offense of *arson* in the night time, in the city of New York, in Nov. 1864, and also with being at that time within the Federal lines as a *Spy;* he being at the time an officer in the Confederate army, but disguising his rank and character in the dress of a citizen.

By the restoration of *peace*, and the *writ of habeas corpus*, the military law and rule has become, as before the war, subordinate to the civil.

*Arson* is not a crime for which a prisoner can be tried by *military court or commission*, without a disregard of the provisions of the constitutions of both the State and the General Government, securing a trial by jury.

There is no case where any person has ever been held or tried as a *Spy* who was not taken before he had returned from the territory held by his enemy, or who was not brought to trial and punishment during the existence of the war.

The prisoner, in this case, was not taken in the act of committing the offense charged against him of being a *Spy*. He had returned within the lines of the Confederate forces, or had otherwiss escaped, so that he was not arrested till after the Confederate armies had surrendered, been disbanded and sent to their homes, with the promise that they should not be further disturbed, if they remained there and engaged in peaceful pursuits.

*At Chambers, New York, December,* 1865.
ON HABEAS CORPUS.

JEREMIAH G. LAROCQUE, *for relator.*
SAMUEL G. COURTNEY, *Assistant U. S. District Attorney,*
*for respondent.*

In the matter of Robert Martin.

LEONARD, J.   The applicant is held as a prisoner by Major General Hooker, who commands this military department, under certain orders issued from the war office at Washington, by the authority of the President.   The orders for the detention of the prisoner show no cause for the arrest, but the return of General Hooker' on oath states that he is charged with the offense of arson in the night time, in the city of New York, November, 1864, and also with being at that time within the Federal lines as a spy, he being at the time an officer in the Confederate army, but disguising his rank and character in the dress of a citizen.

The question is whether the prisoner is so held by lawful authority ?

We look in vain for the authority on the face of the process, where in civil cases it ought to be fully disclosed. Indeed, there is no process at all by which he is detained. It is simply an order, in the briefest terms, directing Robert Martin to be transferred to General Hooker for trial.   If the offenses exist, and are of a purely military character, I do not question the sufficiency of these orders under the Code by which the arrest was made, and under which the military authorities propose to hold the prisoner for trial. The terms of proceeding for the arrest and trial of military offenders sre not governed by the same rules for the protection of the rights and liberty of the person as are required in civil tribunals.   The former is adopted from the necessity of the circumstances existing ; often in camp ; nearly always requiring summary action, and the exercise of large discretion.

The most direct language to express the intentions of the officer authorized by the usages of war among civilized nations to direct such momentous power must be considered sufficient, and not subject to criticism by civil jurists.

The offense of arson is one well known to the statutory law of every state, as well as at common law ; but the offense of being a spy is not known to the civil or statutory law, and is one of a purely military character, cognizable only in time of war, and before a tribunal having its life, existence and

In the matter of Robert Martin.

authority created, continued and defined by purely military power.

I do not question that the crime of arson, even when committed in places remote from military camps, forts, arsenals or other places directly connected with military operations, as in the case of the prisoner, may be a military offense, and as such cognizable, in time of war, before a military court, by the usage and law of nations. The protection of the government and of its individual members makes war, armies and a submission to military rule in the community a necessity. When the necessity arises, the military power is paramount, and the laws are silent. But war is an anomulous condition. When peace is restored, or the necessity for military rule has terminated, the supremacy of the laws is restored.

During the late war for the suppression of the rebellion, it was deemed necessary by the milita.y power to suspend the operation of the laws in the loyal states only so far as the privilege of the writ of habeas corpus was concerned. This measure was considered necessary in the exercise of the war power, for the public safety, and was for the most part, cheerfully submitted to by the people engaged in the avocations of civil life, far removed from the active operations of armies in the field, abiding with confidence the restoration of their civil rights, reasonably abridged only during the national peril. Now peace has returned. The President has recalled, by his proclamation, the suspension of the writ of habeas corpus. The restoration of this writ was a public acknowledgment by the military as well as the civil chief of the United States, that peace is established, and that the civil authorities in the loyal states are required to resume the exercise of the duties and functions that pertain to the conditions of peace.

The military law and rule has now become, as before the war, subordinate to the civil. The necessity for the sudden arrest, the instant visitation of vengence, or the punishment of offenses known and regulated by statutory law, by the swift and hasty trial before a court martial or "military

In the matter of Robert Martin.

commission," has ceased within the limits of the loyal states. I do not now refer to that large class of offenses coming under the constitutional provision, authorizing congress " to make rules for the government and regulation of the land and naval forces," and " cases arising in the land and naval forces," such as mutiny, desertion, etc. These offenses constitute an exception to the provision that " no person shall be held to answer for a capital or otherwise infamous crime, unless on a presentment or indictment of a grand jury."

This allusion will suffice as an answer to the authority of *Martin* agt. *Mott* (12 *Wheat.* 19), so much relied on by the counsel for the respondent as controlling in the present matter. Time is wanting to review fully the legal authorities that have been cited by the learned counsel for either party, who have so nobly aided me in arriving at my conclusion. As an illustration of the exclusive jurisdiction of courts martial in cases arising within the land or naval forces of the United States, in time of peace, it is only necessary to refer to the extraordinary case of the *United States* agt. *Mackenzie* (1 *N. Y. Legal Observer*, 371), where it was held that the civil tribunals had no jurisdiction in the case of Captain Mackenzie, then on trial in the harbor of New York before a naval court martial, on a charge of murder on the high seas, on board the U. S. sloop of war Somers, by hanging three of the crew for mutiny. And as a further illustration that the military are subordinate to the law before a civil court, we can refer to the case of *Wilson* agt. *Mackenzie* (7 *Hill* 95), where trespass was maintained in the state courts against a naval officer for assaulting and imprisoning one of his subordinates, though the act was done on the high seas, under the cover of naval discipline. The case is very instructive, but I cannot now attempt anything more than a reference. I have no doubt but the act of congress withdrew the cognizance of crimes in the service from the courts of civil jurisdiction, and placed them in that of courts martial.

The act of congress creating " military commissions" seems to be a regulation of military tribunals by statute,

and imposing a new name for courts martial, and defining certain offenses, some of which were not previously regarded as military offenses. The act was designed for a time of war and great national peril. It cannot be supposed that congress designed that "military commissions" should supercede civil tribunals in a time of peace. It required the suspension of the habeas corpus to enable such a commission to try any offense in the midst of loyal states, where it was cognizable in the civil courts. Nothing less could have relieved the state courts from the performance of the duties imposed by law and statute, of taking cognizance of all offenders against the laws of the loyal states, and bringing them to trial in the state courts to the exclusion of every military tribunal, whether called a court martial or "military commission."

In respect to the crime of arson, mentioned in the return of the distinguished general who is here the respondent, its location and description brings it exactly within the definition of that offense in the first degree contained in the statutes of the State of New York. The offense was committed in that city, within the jurisdiction of the criminal courts of the State of New York. It is the duty of every judge of the supreme court, and of every magistrate before whom a writ of habeas corpus can, by law, be made returnable, to take cognizance of such a crime when presented on proper proof, and commit the alleged offender to be proceeded against by law in the courts of this state.

I see no reason why the prisoner should not be tried for the offense with which he is charged, if the evidence is sufficient to make it the duty of a grand jury to find an indictment against him.

Arson is not a crime for which the prisoner can be tried by a military court or commission, without a disregard of the provisions of the constitutions of both the state and the general government, securing a trial by jury. If the writ of habeas corpus were now suspended, the judiciary of the state might be powerless to prevent such an infraction of the constitution, but the President has deemed it now

In the matter of Robert Martin.

proper to withdraw the restriction upon the power of the courts to issue that writ, and to restore to the community in which we live, the full blessings of peace, and the protection of the law.

The other charge alleged against the prisoner at this present time falls into insignificance, when contrasted with the horrible crime of attempting, with other confederates, to destroy the city of New York by fire, in the night, without regard to the inevitable destruction of human life among the tens of thousands of non-combatants, including youth and old age, who were exposed to the merciless vengeance of this supposed fiend.

It appears that the prisoner was not taken in the act of committing the offense charged against him, of being a spy. He had returned within the lines of the Confederate forces, or had otherwise escaped, so that he was not arrested till after the Confederate armies had surrendered, been disbanded and sent to their homes, with the promise that they should not be further disturbed if they remained there and engaged in peaceful pursuits. The offense of being a spy is cognizable exclusively by military tribunals, under the law of nations. Perhaps it required an act of the supreme law making power of the Government to fix this offense and its penalty upon a person owing allegiance to the United States, although engaged in rebellion and in arms against the lawful authorities. But the congress has not so extended the liability to punishment against the spy as to increase the time for its infliction beyond the period recognized by the laws of war among civilized nations. What particular act the prisoner committed, indicating that he was lurking or acting as a spy, except the fact that he was here in citizen's garb while holding an office in the armies of the rebellion, and attempting with others to set the city of New York on fire, is not specified.

I know of no case in modern history or in reports of cases decided in the courts where any person has been held or tried as a spy who was not taken before he had returned from the territory held by his enemy, or who was not brought

In the matter of Robert Martin.

to trial and punishment during the existence of the war. The lives of all rebels are forfeited when taken in an act of war or insurrection, and history affords innumerable examples of punishment by death being inflicted after armed resistance had been suppressed. Their pardon is an act of clemency by the rightful authority whenever the supremacy of the laws has been restored, without conditions having been obtained by those in rebellion.

It needs not any additional charge of having looked or acted as a spy, to exact the life of an offender under these circumstances.

The restoration of peace absolved all offenses by the public enemy committed during the existence of the war, so far at least as the acts committed are sanctioned by the laws of war, except in the case of rebellion, in which case the crime of treason still remains, and may be punished.

I am unable to perceive how the prisoner can now be lawfully arraigned before a military tribunal for the offense of being a spy. There is no constitutional power to pass any law authorizing such a trial, conviction and punishment as that contemplated in the case of the prisoner, especially within the borders of a loyal state. If he were charged with treason, neither the military commission or a court martial could lawfully entertain the charge. The crime of treason or of being a spy is not one of those within the constitutional provision for passing laws regulating the army and navy.

The affidavit of General Hooker, although founded on information and belief, is sufficient ground for holding the prisoner under the custody of the civil authorities of the state, until the evidence in the possession of the general government or the military officers can be produced before a grand jury or a committing magistrate.

I shall direct the prisoner to be discharged from the custody of the respondent, General Hooker, and that he be committed to the warden of the city prison.